**SIGNED THIS: September 21, 2009**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DAVID N. WHIPPLE and | ) | |
| SALLY K. WHIPPLE, | ) | No. 09-80090 |
| | ) | |
| Debtors. | ) | |

**O P I N I O N**

Negative equity in a trade-in vehicle rolled over into a purchase money loan gives rise to an issue of statutory construction regarding the hanging paragraph. Most courts use state law to define "purchase money security interest." This Court agrees with the minority position that Congress intended the hanging paragraph to be interpreted as a matter of federal law so that "purchase money security interest" is accorded a uniform federal definition.

In their Second Amended Chapter 13 Plan, the Debtors, David and Sally Whipple (DEBTORS), propose to strip down the claim of Ford Motor Credit Company LLC (FMCC) secured by a 2007 Ford Escape, classifying FMCC as having a secured claim in the amount

of $20,284.00, based on their opinion of the Escape's current value. Within the 910 days preceding the bankruptcy filing, the DEBTORS traded in a 2005 Ford vehicle and purchased the 2007 Escape with funds borrowed from FMCC. At the time of the purchase, they still owed $19,945.69 on the 2005 Ford, but were given only a $14,000 trade-in allowance. The negative equity of $5,945.69 was rolled over into the new loan, thereby increasing the amount financed by that figure to a sum of $33,234.64.[1] FMCC filed a proof of claim asserting that the petition date balance due on the loan was $24,736.34.

FMCC objects to confirmation, arguing that it holds a 910 claim exempt from strip-down by operation of the hanging paragraph, so that the amount of its secured claim must be determined by the petition date balance rather than the Escape's fair market value. The DEBTORS, conceding that they purchased the Escape within 910 days of filing, contend that the hanging paragraph does not protect FMCC against bifurcation because the term "purchase money security interest" does not include the refinancing of negative equity in a trade-in.

The hanging paragraph provides as follows:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11U.S.C. § 1325(a).

---

[1] The cash price for the Escape was $25,245. Additional amounts financed included a Service Contract purchased for $1,195, GAP insurance for $395, a document fee of $50.48, and title and licensing fees of $895.47. A rebate of $500 was given as a credit.

Courts are divided over how to interpret "purchase money security interest." The majority rule is that the term should be defined by the state law applicable to the secured transaction. A uniform definition of "purchase money security interest" does not exist among the states, however, and two main branches of decision have developed. One branch holds that the creditor's purchase money security interest, as defined under state law, covers the entire loan, including refinancing of negative equity. *See, e.g., In re Ford,* 574 F.3d 1279 (10th Cir. 2009)(Kansas law); *In re Price,* 562 F.3d 618 (4th Cir. 2009) (North Carolina law); *In re Graupner,* 537 F.3d 1295 (11th Cir. 2008) (Georgia law); *In re Howard,* 405 B.R. 901 (Bankr.N.D.Ill. 2009) (Illinois law); *In re Myers,* 393 B.R. 616 (Bankr.S.D.Ind. 2008) (Indiana law). The other branch, also relying on state law, holds that refinanced negative equity is not encompassed within the statutory provision. *See, e.g., In re Penrod,* 392 B.R. 835 (9th Cir.BAP 2008) (applying general Uniform Commercial Code analysis); *In re Hall,* 400 B.R. 516 (Bankr.S.D.W.Va. 2008) (West Virginia law); *In re Crawford,* 397 B.R. 461 (Bankr.E.D.Wis. 2008) (Wisconsin law).

Additional divergent offshoots have developed. Those courts that hold that negative equity is not part of the purchase money security interest must then consider the effect of that determination, which, for most of them, is also a question of state law. Some courts hold that the presence of negative equity transforms the entire security interest into a non-purchase money one (the "transformation rule"). Other courts divide the loan into two parts, holding that the lender retains purchase money status only on the purchase money portion of the loan (the "dual status rule"). Those courts that follow the dual status rule must also determine how to allocate the payments made on the loan, as between the

purchase money and non-purchase money portions. It is an additional unresolved question whether this allocation is to be made based on state law or newly created federal common law.[2]

A straighter path has been mowed. A small but growing minority of courts reject the notion that the term "purchase money security interest" should be defined by state law, beginning with *In re Westfall,* 376 B.R. 210 (Bankr.N.D.Ohio 2007). Advocating the need for uniformity, the court determined that it was not bound by Ohio's use of the transformation rule and, instead, adopted the dual status rule as a matter of federal common law because the transformation rule is "too severe." *Id.* at 219.

Then in *In re Muldrew,* 396 B.R. 915 (E.D.Mich. 2008), the district court determined according to the plain language of the hanging paragraph, interpreted as federal law without regard to state law, that the term purchase money security interest covers negative equity refinanced as part of the same transaction for the purchase of a vehicle, where the buyer pledges the new vehicle as collateral for the entire amount of the loan.[3] Congress having decided not to create a Code definition, the court reasoned that the term purchase money security interest is not to be given a "special meaning." *Id.* at 925.

Next, in *In re Pruitt,* 401 B.R. 546 (Bankr.D.Conn. 2009), emphasizing the constitutional imperative of uniformity, the court reasoned that the Bankruptcy Code, as a general rule, preempts state laws that pertain to the same subject matter. *Id.* at 551-54.

---

[2]The Uniform Commercial Code leaves it to the state courts to determine whether the dual status or transformation rules should be applied to the purchase money status inquiry. Dienna Ching, *Does Negative Equity Negate the Hanging Paragraph?* Am. Bankr. Inst. L. R., Vol. 16, No. 2, at 468. On this issue, the UCC does not provide a uniform rule of decision. Any assumption that the UCC's usage of "purchase-money" in the several iterations set forth in Article 9 Section 9-103 has an undisputed meaning that is "established" or "settled" or "uniform" is unfounded.

[3]Alternatively, the court determined that the same result would have been reached under Michigan law.

The court distinguished the claims allowance process, which largely incorporates state law, from the process by which an allowed claim is characterized for purposes of treatment in the bankruptcy case, a process that is "wholly federal." *Id.* at 557. The court concluded that the plain language of the hanging paragraph evidences a Congressional intent that the disabling of Section 506's bifurcation rules should have a general and uniform application.[4] *Id.* at 562. This Court agrees.

Because the Bankruptcy Code is a uniform federal scheme, injecting state law as a rule of decision should never be done lightly. Primary consideration must be given to the overarching principle that Congress intends the bankruptcy laws to be applied as uniform federal rules of decision. The constitutional demand for uniformity is tempered only by the recognition that Congress has the authority to allow any particular rule of decision to be governed by state law, thereby sacrificing uniformity on the altar of federalism. *See Butner v. United States,* 440 U.S. 48, 54 n. 9, 99 S.Ct. 914, 918, 57 L.Ed.2d 1120 (1979). So the threshold issue here is: When Congress used the phrase "purchase money security interest" in Section 1325(a), did it intend a uniform meaning to be applied with national consistency, or did it intend that the phrase be defined by state law, with an inevitable lack of uniformity?

One court that addressed this issue head-on is the Ninth Circuit Bankruptcy Appellate Panel in *In re Penrod, supra.* Deciding to use the Uniform Commercial Code as the preferred source for a definition of "purchase money security interest," the panel applied a general presumption that federal courts should incorporate state law as the

---

[4] The court's reasoning is laid out in the context of its consideration of whether the hanging paragraph should be applied differently when surrender of collateral is proposed.

federal rule of decision. 392 B.R. at 843-44. A second opinion that analyzes the issue is *In re Ford, supra,* where the Tenth Circuit applied a presumption for state law as the rule of decision that is specific to the phrase "purchase money security interest." In this Court's view, both *Penrod* and *Ford* incorrectly adopt a presumption favoring state law.[5]

**There is no general presumption for the incorporation of state law as the bankruptcy rule of decision.**

The Bankruptcy Code is enacted pursuant to the constitutional imperative for a uniform federal law. U.S. Const. Art. I, § 8, cl. 4. With a few limited exceptions, debtors and creditors in bankruptcy cases are subject to the same rules of decision no matter where the cases are filed. A presumption of uniformity arises out of the constitution's grant of power to Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States." *Id.* Such a presumption operates against incorporating state law as the rule of decision unless the language or context of a particular provision requires otherwise.

The Supreme Court has, in certain narrow instances, indicated that it is appropriate for a federal court, applying a federal statute, to look to state law for guidance when developing rules of federal common law. But the Supreme Court has also guided lower federal courts not to defer to state rules of decision when implementing federal legislation unless (1) directed to do so by Congress or (2) the states have a predominant interest in preserving control over the particular rule of decision and allowing the states to do so will not impede the federal scheme.

In *Clearfield Trust Co. v. U.S.,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (Douglas, J.), the court determined that the rights and duties of the United States regarding

---

[5] Other courts use similar presumptions. This Court's focus on *Penrod* and *Ford* is driven by the fact that those courts did a good job of explaining what presumption was being used and why.

commercial paper it issues are governed by federal rather than state law. 318 U.S. at 366. Rejecting the district court's ruling that required the United States to comply with a state law requirement to give timely notice of forgery, the court concluded that "[i]n absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." 318 U.S. at 367. Emphasizing the need for a single federal rule, Justice Douglas reasoned as follows:

> In our choice of the applicable federal rule we have occasionally selected state law. *See Royal Indemnity Co. v. United States, supra.* But reasons which may make state law at times the appropriate federal rule are singularly inappropriate here. The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain.

*Id.*

*Textile Workers Union of America v. Lincoln Mills of Ala.,* 353 U.S. 448, 456-57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (Douglas, J.), holds that federal courts, under the Taft-Hartley Act, are authorized to create federal common law for the enforcement of collective bargaining agreements. Addressing the interplay between federal and state law, Justice Douglas stated:

> The question then is, what is the substantive law to be applied in suits under § 301(a)? We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws. *See \*457* Mendelsohn, *Enforceability of Arbitration Agreements Under Taft-Hartley Section 301,* 66 Yale L.J. 167. The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The

range of judicial inventiveness will be determined by the nature of the problem. *See Board of Commissioners of Jackson County v. United States*, 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L.Ed. 313. Federal interpretation of the federal law will govern, not state law. *Cf. Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 485, 87 L.Ed. 640. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. *See Board of Commissioners of Jackson County v. United States, supra*, 308 U.S. at pages 351-352, 60 S.Ct. at pages 288-289. Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.

So the preference for federal courts, when fashioning federal common law, is to adopt a single uniform rule that best effectuates the federal policy. In so doing, the federal courts may borrow from state law but if they do, the state rule is simply absorbed into the federal common law and its application is thereafter determined solely as a matter of federal law.[6]

Representative of the exceptional situation where each state's law is incorporated as the rule of decision at the expense of uniformity, *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (Marshall, J.), holds that the demand futility exception as defined by the law of the state of incorporation applies to a derivative action brought under the federal Investment Company Act. Giving deference to the history of state regulation of corporations, the Supreme Court recognized that "[s]uperimposing a rule of universal-demand over the corporate doctrine of [the] States would clearly upset the balance that they have struck between the power of the individual shareholder and the power of the directors to control corporate litigation." *Id.* at 103. The Court narrowly constrained the scope of its holding, as well as the presumption in favor of incorporating state law rules of decision, to issues involving gaps in the federal securities laws that bear on the allocation of corporate powers. *Id.* at 108. Moreover, the court

---

[6]It is important to distinguish between using a particular state's law as a template for crafting a uniform federal rule of decision, and incorporating state law (i.e., the law of each state) as the rule of decision. The former provides uniformity; the latter does not.

8

emphasized the desirability of uniform federal rules when the "scheme in question evidences a distinct need for nationwide legal standards." *Id.* at 98.

Likewise, in *U.S. v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979) (Marshall, J.), the court reiterated that federal programs that by their nature are, and must be, uniform in character throughout the nation necessitate formulation of controlling federal rules. The Bankruptcy Code is, quintessentially, a federal law that is premised on uniform rules of decision. Federal bankruptcy law has a goal of national uniformity rather than congruence with state law. *In re Jafari,* 569 F.3d 644, 648 (7th Cir. 2009).

In *Butner, supra,* the Supreme Court held that where the Bankruptcy Act of 1898 did not define a mortgagee's interest in the rents and profits generated by the mortgaged property during the pendency of the bankruptcy case, the mortgagee's interest, as a property right, is determined by the law of the state in which the property is located. The court based its holding on the fact that Congress, in the Bankruptcy Act, did not address a mortgagee's rights to the rents and profits of the real estate generated during the bankruptcy case, and on the principle that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." 440 U.S. at 54, 99 S.Ct. at 917-18. With respect to the issue of uniformity, the court acknowledged the constitutional expectation that bankruptcy laws be uniform, 440 U.S. at 54, 99 S.Ct. at 917, as well as the power of Congress to disregard uniformity in favor of state laws in certain particular instances, 440 U.S. at 54, n.9, 99 S.Ct. at 918, n.9. Balanced against the desirability of uniformity, the court recognized the need to allow state law to define property interests

in order to facilitate the "uniform treatment of property interests by both state and federal courts within a State," including, in addition to issues of ownership, the existence of security interests, including a mortgagee's interest in rents. 440 U.S. at 55, 99 S.Ct. at 918. Since a property interest was at issue, the court determined that either an express "congressional command" or an "identifiable federal interest" must justify adopting a uniform federal rule, but not merely "undefined considerations of equity." 440 U.S. at 55-56, 99 S.Ct. at 918. The court concluded that equity does not require that all mortgagees be afforded an automatic security interest in rents during bankruptcy, only that they be afforded the same interest and opportunity to protect that interest as they would have under state law. 440 U.S. at 56-57, 99 S.Ct. at 918-19.

*Butner's* teaching with respect to uniformity may be summarized as follows. Begin with the constitutional principle of uniformity for rules of decision under the bankruptcy laws. If the issue involves determination of a property interest concerning ownership of an asset or whether an asset is encumbered by a mortgage or security interest, prefer state law as the rule of decision unless the legislation states otherwise or an identifiable federal interest in uniformity is present.

The property interest exception to the general rule of uniformity is not triggered by the issue at bar concerning the hanging paragraph. FMCC's security interest in the 2007 Ford Escape is conceded. Thus the issue is not whether FMCC has a property interest in the vehicle – it does. The issue is only whether that interest is modifiable in a Chapter 13 plan. Therefore, the preference for state law under *Butner's* property interest exception to the general rule that uniform rules of decision apply in bankruptcy is not applicable.

Any suggestion that the Supreme Court has announced a general presumption for incorporating state law rules of decision into the federal bankruptcy laws is simply not correct. For exceptional policy reasons, the Supreme Court recognizes that although Congress has the power to establish uniform federal rules regarding creditors' rights in estate assets and the determination of creditors' claims in bankruptcy cases, Congress has largely deferred to state law in those specific areas. *See Butner,* 440 U.S. at 54 (Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law); *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) (the "basic federal rule" in bankruptcy is that state law governs the substance of claims).[7] These areas are exceptions that are carved out of the general rule of uniformity. Other than those specific areas where Congress or the Supreme Court has expressly incorporated state law, the constitutional principle of uniformity is predominant.[8]

**No term-specific presumption applies to "purchase money security interest."**

Rather than applying a general presumption in favor of state law, the Tenth Circuit, in *Ford*, *supra,* applied a presumption specifically limited to the term "purchase money

---

[7]*Butner* is occasionally mis-cited as a broad-brush statement by the Supreme Court favoring the incorporation of state law in bankruptcy cases. As made abundantly clear in *Pruitt, supra,* however, *Butner* narrowly deals only with the nature and extent of property interests, not with the characterization of claims for bankruptcy purposes and not with any other bankruptcy issue. *Pruitt,* 401 B.R. at 564-65.

[8]The *Penrod* opinion also cites Supreme Court case law for the proposition that a federal court should generally incorporate state law as the federal rule of decision when filling in the gaps or "interstices of federal remedial schemes." *Penrod,* 392 B.R. at 843-44. Apart from the fact that the Bankruptcy Code is not a "remedial scheme" of the kind referenced in the cited cases, determining what Congress meant when it used the phrase "purchase money security interest" is an exercise in statutory interpretation not a gap filling function. Moreover, the proposition itself appears to be inaccurate, or at least in dispute, as the Supreme Court has stated that federal courts are to "fill the interstices of federal legislation according to their own standards." *U.S. v. Kimbell Foods, Inc.,* 440 U.S. 715 at 727 (quoting *Clearfield Trust Co. v. U.S.,* 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed 838 (1943)).

security interest": "we presume Congress intended that term as used in BAPCPA to be interpreted according to state law." 574 F.3d at 1283. Since courts have used state law to define the antipodal term "nonpurchase-money security interest" that appears in Section 522(f)(1)(b), the Tenth Circuit viewed it as "settled" that when used in the Bankruptcy Code, purchase money security interest is defined by state law.[9] *Id.*

Section 522, however, is the Code section providing for exemptions in property that debtors may claim in furtherance of their fresh start, a substantive area in which express deference is given to the interests of the states to determine the exemptions to which residents are entitled. *See* 11 U.S.C. § 522(b)(2) (permitting the states to opt out of the federal exemptions and force residents to use state exemptions in bankruptcy cases).

The area of exemptions is one of the few where Congress explicitly chose to allow state law to serve as the rule of decision in bankruptcy cases. The hanging paragraph is set forth in Section 1325 which addresses Chapter 13 plan confirmation standards, a substantive area that exists only in bankruptcy. Given these differences in the functions of and policies behind the two sections, the proposition that because courts resort to state law to define "nonpurchase-money security interest" in Section 522, Congress is therefore presumed to have intended the term "purchase money security interest" as used in Section 1325 to be defined by state law as well, is a *non sequitur*.[10]

---

[9]Prior to BAPCPA, the term "purchase money security interest" was not found in the Bankruptcy Code. BAPCPA originated its usage in the hanging paragraph and in Section 524(k)(3)(G), where its usage is a nonsubstantive one pertaining to certain disclosures in reaffirmation agreements. Section 1110(d)(2) uses the term "purchase-money equipment security interest" solely for purposes of that section, which deals with aircraft equipment and vessels.

[10]The Supreme Court recognizes that even identical words used in different parts of the same act may well have different meanings based upon the varying purposes of the provisions. *U.S. v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 121 S.Ct. 1433, 1441, 149 L.Ed.2d 401 (2001).

12

It has been suggested that the Seventh Circuit's decision in *In re Wright,* 492 F.3d 829 (7th Cir. 2007), supports the proposition that "purchase money security interest" is to be defined by state law. *See In re Crawford,* 397 B.R. 461, 464 (Bankr.E.D.Wis. 2008). This Court respectfully disagrees. *Wright* holds that the hanging paragraph's elimination of Section 506 does not preclude a creditor to whom collateral is surrendered in a Chapter 13 plan from having an allowed unsecured claim for any deficiency. Whether "purchase money security interest" is to be defined under state law or federal law was not at issue. What was at issue – whether the creditor would have an unsecured claim – was properly determined as a matter of state law under the rule of *Butner v. United States, supra.*

As recognized by the Seventh Circuit, whether a creditor holds a debt or has a security interest is properly determined under state law. *Wright,* 492 F.3d at 832-33. The hanging paragraph's effect comes into play only *after* it has been determined, under state law, that the creditor is owed a debt that is secured by a security interest. The question then is whether the creditor is entitled to special treatment – no stripdown – under the Chapter 13 plan. The conditions for receiving special treatment, as spelled out in the hanging paragraph, are purely a matter of federal bankruptcy law. The states have no cognizable interest in how "purchase money" is defined for Chapter 13 plan purposes.[11] *Kamen v. Kemper Financial Services, Inc., supra,* is thus entirely distinguishable, reinforcing the conclusion that the hanging paragraph is not to be treated as an exception to the general rule of uniformity.

---

[11] The historical state-law policy of granting primacy to purchase money security interests over prior perfected non-purchase money liens is not offended by the hanging paragraph. Fairness to purchase money lenders and encouraging business borrowers to purchase new equipment are oft-stated rationales for according priming power to purchase money liens. *See* Grant Gilmore, *Security Interests in Personal Property,* § 28.1 *et.seq.* (1965).

13

**The language and context of the hanging paragraph support a uniform federal rule of decision.**

The language of the hanging paragraph, as well as its context, militate strongly in favor of a single, uniform definition. The context consists not only of other sentences or related provisions, but also of the real-world situation to which the language pertains. *Matter of Handy Andy Home Improvement Centers, Inc.,* 144 F.3d 1125, 1128 (7th Cir. 1998). The issue of debtors buying cars shortly before filing bankruptcy has a long and varied history. Some courts treated the issue as a question of whether the debtor's conduct demonstrated a lack of good faith. *In re Mathenia,* 220 B.R. 427 (Bankr.W.D.Okla. 1998); *In re Segura,* 218 B.R. 166 (Bankr.N.D.Okla. 1998); *In re Sharon,* 200 B.R. 181 (Bankr. S.D.Ohio 1996); *In re Mitchell,* 191 B.R. 957 (Bankr.M.D.Ga. 1995); *In re Baez,* 106 B.R. 16 (Bankr.D.Puerto Rico 1989). Other courts determined that an eve-of-bankruptcy purchase should be factored into the vehicle's valuation for cramdown purposes. *In re Spraggins,* 316 B.R. 317 (Bankr.E.D.Wisc. 2004); *In re Barnes,* 191 B.R. 963 (Bankr.M.D.Ga. 1996).

Prior to the enactment of BAPCPA, the Bankruptcy Code did not directly address the issues raised by a debtor's eve-of-bankruptcy purchase of a vehicle on credit. Determinations were made by the courts on a case-by-case basis with inconsistent results. The hanging paragraph was obviously intended to bring consistency to an issue where it was previously lacking. Dienna Ching, *Does Negative Equity Negate the Hanging Paragraph?* 16 Am. Bankr. Inst. L. Rev. 463 (2008) (legislative history of hanging paragraph indicates congressional intent to remedy the cram down effect of Section 506 bifurcation of claims in auto lending industry). Rather than let bankruptcy courts continue to address, on an *ad*

*hoc* basis, the eve-of-bankruptcy purchase scenario, Congress established a bright-line time frame of 910 days and a common federal definition of "motor vehicle." Creditors who finance a purchase within 910 days of filing receive preferred treatment – no stripdown – over creditors whose loans were made prior to the 910th day.

Nothing in the language of the hanging paragraph (or the little legislative history that exists) indicates an intent that state law should define "purchase money security interest." To the contrary, Congress routinely and expressly incorporates state law when it wants to, and did not do so here. For example, Section 544 specifically incorporates "applicable law" as the source of definition for the common term "bona fide purchaser." 11 U.S.C. § 544(a)(3). *See, also,* Section 502(b)(1) (incorporating "applicable law"); Section 506(b) ("state statute"); Section 522(b)(3)(A) ("state or local law"); Section 1322(c)(1) and (e) ("applicable nonbankruptcy law"). The absence of any reference to state or nonbankruptcy law is a significant factor that weighs against using state law for the rule of decision.

Thus, there is both a contextual and a textual indication of intended uniformity. Contextually, the hanging paragraph provides statutory rules that address an issue that had previously been dealt with as a matter of individual court discretion. Textually, the use of a specific time frame, 910 days, the incorporated uniform, federal definition of "motor vehicle" and the absence of an express reference to state law, are evidence that Congress intended the hanging paragraph to create a uniform federal rule of decision. Therefore, consistent with the constitutional principle of uniformity, this Court finds that Congress intended the hanging paragraph, generally, and the term "purchase money security interest," specifically, to be accorded a single, uniform meaning, not dependent upon or subject to the variations in the state law definitions of that term.

Having determined that Congress intended the hanging paragraph to have a single, uniform, federal meaning, the question is: "what meaning?" Does the presence of refinanced negative equity combined with a purchase money loan, affect whether the lender holds a purchase money security interest? If a textual answer exists, resort to an outside definition or the creation of one as federal common law is unnecessary. Several courts have concluded that the answer provided by the text is that the presence of negative equity, refinanced as part of a purchase money loan, does not destroy or affect the purchase money status of the security interest. *In re Sanders,* 403 B.R. 435 (W.D.Tex. 2009); *In re Muldrew,* 396 B.R. 915 (E.D.Mich. 2008); *In re Dale,* 2008 WL 4287058 (S.D.Tex. 2008), *aff'd,* --- F.3d ----, 2009 WL 2857998 (5th Cir. 2009); *In re Padgett,* 408 B.R. 374 (10th Cir.BAP 2009) (Starzynski, J., concurring). This Court agrees with these courts.

The critical phrase at issue, "if the creditor has a purchase money security interest securing the debt that is the subject of the claim," raises a simple question. Is the creditor's *debt* secured by a purchase money security interest? The term "debt," a singular noun, refers to the loan that combines the purchase money funds and the refinanced negative equity – a single, unitary loan that creates one debt that gives rise to one claim. The statutory language "securing *the debt* that is the subject of *the claim*" evidences an intent that courts treat the debt and the corresponding claim as indivisible for purposes of applying the hanging paragraph.[12] The statute precludes separating the debt into two components,

---

[12] Indivisibility is also consistent with the conduct of the parties. A separate loan could have been written for the purpose of refinancing the negative equity, but the parties to the transaction chose to create a combined loan.

16

one for the purchase money funds and the other for the negative equity. *See Padgett,* 408 B.R. at 385-86 (Starzynski, J., concurring).

"Security interest" is defined to mean lien created by an agreement. 11 U.S.C. § 101(51). "Lien" means charge against or interest in property to secure payment of a debt or performance of an obligation. 11 U.S.C. § 101(37). As is customary, the security interest granted by the DEBTORS in the 2007 Ford Escape is set forth in a Motor Vehicle Retail Installment Contract, the same document that evidences the loan and terms of repayment. By its terms, the security interest secures the entire amount of the loan. So FMCC holds a single security interest that secures a single debt. But, is it a "purchase money" security interest? The answer to the question is aided by examining the purpose for the modifier.

As a modifier, "purchase money" serves to exclude non-purchase money security interests from the scope of the hanging paragraph. It cleaves the universe of loans into two subsets: those that are purchase money and those that are not. Where the lender advances funds used by the borrower to buy the car, the loan (and the security interest) is purchase money. Where the lender takes a lien on a car that the borrower already owns, its interest is non-purchase money. This simple distinction flows from the plain meaning of the statutory language. There is no need to resort to outside sources. If all or part of the lender's funds were paid to the seller for all or part of the purchase price of the car, the lender has a security interest that is "purchase money" as a matter of federal bankruptcy law.

The language of the hanging paragraph draws an elementary distinction between purchase money and non-purchase money loans. The broadly phrased statute is not

limited "to the extent" or to the "portion" of the loan proceeds that went toward the purchase price. *See Sanders,* 403 B.R. at 439. It does not differentiate loans that are only partly purchase money. It does not slice the purchase money concept any finer based upon other uses of a portion of the loan proceeds. Since Congress elected to make the rule of decision a general one, courts should not read into the statute any finer distinctions that Congress chose not to incorporate.

There is no dispute that FMCC's loan proceeds were paid to the seller for the purchase price of the Ford Escape. Thus, as a matter of federal law, FMCC holds a purchase money security interest in the Escape for purposes of the hanging paragraph. The fact that a portion of the loan proceeds was used to refinance negative equity in a trade-in does not affect the nature of its security interest as a purchase money one. As the holder of a purchase money security interest, FMCC's claim may not be bifurcated under Section 506 for purposes of its treatment in the Plan. FMCC's objection to confirmation is meritorious and confirmation must be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###